

ATTORNEYS FOR APPELLANT

Edward J. Calderaro
Kristin R. Valdivia
Sachs & Hess, P.C.
St. John, Indiana

ATTORNEY FOR APPELLEE

George P. Galanos
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Paternity of
T. M.-B. (Child),

Robert E. Bush,

*Appellant-Petitioner,*

v.

Julie Mapletoft,

*Appellee-Respondent*

June 28, 2019

Court of Appeals Case No.
18A-JP-2907

Appeal from the Lake Superior
Court

The Honorable Thomas P.
Stefaniak, Judge

The Honorable Aimee M. Talian,
Magistrate

Trial Court Cause No.
45D06-1203-JP-694

**May, Judge.**

[1] Robert E. Bush ("Father") appeals the paternity order entered in his action

against Julie Mapletoft ("Mother") regarding the support of their daughter, T.

M.-B. ("Child"). He raises six issues for our review, which we restate as:

1. Whether the trial court abused its discretion in holding Father's gambling income should be treated as regular income for the purpose of calculating Father's child support obligation;

2. Whether the trial court abused its discretion in awarding Mother credit for healthcare premiums in the amount ordered;

3. Whether the trial court abused its discretion in clarifying a previously agreed order to provide a price range and other guidance to govern the purchase of a horse for Child; and

4. Whether the trial court abused its discretion in finding Father in contempt for failing to pay for horseback riding lessons for 2017-18 and for failing to purchase a saddle for Child.

We affirm in part, reverse in part, and remand.

# Facts and Procedural History

Mother and Father have one daughter, Child. Child was born in 2005. On June 10, 2013, the trial court determined Father's paternity of Child and ordered Father to pay $690.00 per week in child support. The decree directed Mother to carry Child on her work-related health insurance policy. It also directed Father to pay 84% and Mother to pay 16% of the costs associated with Child's extracurricular activities. On March 13, 2015, the court entered an agreed order after both Mother and Father filed verified motions for contempt. In relevant part, the order provided:

B. That the 2015-2016 extra-curricular activities will be horseback riding and gymnastics. Mother will pay all of the gymnastics fees if the child decides to do gymnastics. Father will pay all of the horseback riding fees and will buy the child a horse and saddle.

C. That for the years after the 2015-2016 school year, the mother and father will discuss the extra-curricular activities the child chooses and whatever activities are agreed upon, father will pay 84% directly to the school if it is allowed to be paid that way. If not, then he will pay mother and she will pay the bill.

(App. Vol. 2 at 33-34.)

[3] The Illinois State Lottery pays Father an annuity in the gross amount of $423,000.00 per year, and Father supplements this income with casino winnings. Between 2015 and 2017, Father won substantial net amounts at casinos: $164,500.00 in 2015; $90,865.00 in 2016; and $229,415.00 in 2017.

[4] In May 2016, Mother filed a Verified Petition for Modification of Child Support and the Child's Medical Health Coverage. On June 1, 2017, Mother filed a Verified Petition for Rule to Show Cause asserting Father was in contempt for failure to pay child support, failure to pay Child's horseback riding fees, and failure to purchase a horse and saddle for Child. The trial court held a hearing on both petitions on October 24, 2018.

[5] At the hearing, Kieran Dulik, Child's horseback riding instructor, was certified as an expert in that field and testified regarding her experience with Child and Child's riding abilities. Dulik has eighteen years of professional experience

teaching others to ride horses. She began training Child in 2017 in the hunter-jumper style of horseback riding. Child is a beginner when it comes to horseback riding, but she is passionate about the sport and participates in weekly lessons. Child currently uses Dulik's schooling saddle and the cost for borrowing the saddle is included in the Child's lesson fee.

[6] Dulik testified some horses perform better in the hunter-jumper style than others and a horse and rider must have good chemistry. Dulik recommended an experienced horse in the $10,000 to $15,000 price range for a beginning rider like Child, and Mother agrees with this recommendation. Father believes a suitable horse can be found below this price range. Father provided Mother with a list of horses he is willing to purchase for Child, including a horse worth $800. However, Dulik testified that a typical $800 horse would not be suitable for Child because such horses are old and cannot be ridden in the hunter-jumper style. Consequently, the parties have not agreed on the proper horse to purchase for Child.

[7] As to Child's healthcare coverage, Mother testified she began paying for health insurance through Ambetter in December 2017. For the years 2016 and 2017, Mother purchased health insurance for herself and Child through COBRA. Prior to 2016, Mother was married, and her husband covered Child on his health insurance.

[8] On November 9, 2018, the court issued an order with findings of fact and conclusions of law. The court's findings adopt Mother's recalculation of

Father's child support obligation for 2016 and 2017. Thus, the court ordered Father's 2016 child support obligation to be $788.43 per week, retroactive to the date of Mother's petition to modify. The court also determined Father's 2017 child support obligation was $978.14 per week. The court awarded Mother credit of $89.36 per week for Child's weekly health insurance premium for 2016, 2017, and 2018. In relevant part, the order also stated:

> 5. Father receives a yearly annuity in the amount of $423,000.00. The additional income reflected on Father's annual tax returns are the result of Father's casino winnings related to his endeavors as a professional gambler. Father's annual gambling proceeds have and will continue to vary from year to year. Therefore, for purposes of determining Father's income for the year 2018, the Court will utilize an average of Father's income from the two prior years.

> 6. Father's average weekly income for the year 2018 is $11,214.23…Father is ordered to pay child support in the amount of $878.00 per week for the year 2018 and going forward.

> * * * * *

> 11. The minor child currently attends horse riding lessons. This Court's order of March 13, 2015 requires Father to pay for the child's lessons in 2015-2016. This Court does not believe that the parties intended to return to Court every year when the child decided to continue with horse riding lessons. Mother has incurred $1,350.00 in lesson fees for the minor child during the year 2017 and seeks to have Father pay those expenses pursuant to the March, [sic] 2015 order.

(App. Vol. 2 at 22-23.)

[9] The court found Father in contempt for failure to pay Child's 2017 horse riding fees and ordered Father to reimburse Mother for the 2017 horse riding lesson fees in order to purge himself of contempt. The court did not find Father in contempt for failure to purchase a horse but did find him in contempt for failure to purchase a saddle. The court ordered the parties to exchange lists of potential horses for Child in the $3,000.00 to $10,000.00 price range and to visit the horses. Mother, Father, and Child are to be involved in the decision to purchase the horse, with the opinion and assistance of Child's instructor being considered. If the parties cannot agree on a suitable horse, Father may make the final decision.

## Discussion and Decision

[10] A trial court's calculation of child support is presumed to be valid and is reviewed for an abuse of discretion. *Ashworth v. Ehrgott*, 982 N.E.2d 366, 372 (Ind. Ct. App. 2013). An abuse of discretion occurs when a trial court's "decision is clearly against the logic and effect of the facts and circumstances before it or if it has misinterpreted the law." *Id*. Similarly, the issue of contempt is left to the sound discretion of the trial court and we review such findings under an abuse of discretion standard. *Reynolds v. Reynolds*, 64 N.E.3d 829, 832 (Ind. 2016).

[11] Where the trial court issues specific findings *sua sponte*, as it did in this case, the specific findings control our review and the judgment only as to the issues those

specific findings cover. *Trust No. 6011, Lake County Trust Co. v. Heil's Haven Condos. Homeowners Ass'n,* 967 N.E.2d 6, 14 (Ind. Ct. App. 2012), *trans. denied*. Where there are no specific findings, a general judgment standard applies, and we may affirm on any legal theory supported by the evidence. *Id*. We apply a two-tier standard in evaluating *sua sponte* findings and conclusions: (1) whether the evidence supports the findings, and (2) whether the findings support the judgment. *Id*. We do not reweigh the evidence or assess the credibility of the witnesses. *Mitchell v. Mitchell*, 875 N.E.2d 320, 322 (Ind. Ct. App. 2007), *trans. denied*.

## Father's Gambling Income

[12]    Father argues the trial court improperly treated his gambling income as regular income in determining his child support obligation. A trial court determines a child support obligation by looking at each parent's gross weekly income, which is the actual gross weekly income of a parent employed to his or her full capacity, the potential income of a voluntarily unemployed or underemployed parent, and any imputed income based upon in-kind benefits. *Meredith v. Meredith*, 854 N.E.2d 942, 947 (Ind. Ct. App. 2006). The court determines a parent's potential income by looking at "the obligor's potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." *Id*. However, a parent's past earnings do not necessarily guarantee future earnings.

"Overtime, commissions, bonuses, and other forms of irregular income are included in the total income approach provided by the Guidelines, 'but each is also very fact-sensitive.'" *Id*. at 948 (quoting Child Supp. G. 3, cmt. 2(b)). Father relies on *Meredith* to argue that his casino earnings should be treated as irregular income, with the court ordering Father to pay a fixed percentage of his gambling earnings rather than ordering him to pay a specific amount.

[13] However, Father's gambling earnings differ from the overtime earnings discussed in *Meredith*. Overtime earnings depend on the whims of an employer. A person may volunteer to work overtime, but the employer ultimately controls whether the person will have the opportunity to work overtime and the amount of overtime the person will work. Father, in contrast, is a self-employed professional gambler. Gambling is not a mere hobby for Father. It is his occupation. His profession is fraught with risk, but it has an alluring upside. He controls when he goes to the casino, how long he spends at the casino, and how much money he risks at the casino.

[14] In *Trabucco v. Trabucco*, the husband was a urologist who was arrested for maintaining a marijuana grow operation and convicted of marijuana possession. 944 N.E.2d 544, 547 (Ind. Ct. App. 2011), *trans. denied*. Husband's income fluctuated after the conviction because his medical license was briefly suspended, he had difficulty obtaining malpractice insurance, he lost patients,

and he experienced other problems. *Id*. at 547-48. The trial court calculated husband's gross weekly income by taking the income reported on husband's tax returns over a five-year period, disregarding the highest and lowest annual incomes, and averaging the incomes for the remaining three years. *Id*. at 548. We affirmed the trial court's income calculation. *Id*. at 553. Courts often use income averaging to determine the gross weekly income of self-employed child support obligors. *Id*. at 552. We noted "all forms of self-employment create some level of unpredictability in income, and such factual determinations are best left to the trial court." *Id*.

[15]     Similarly, in the case at bar, we will not substitute our judgment for that of the trial court. Thus, we cannot say the trial court abused its discretion in determining Father's gross weekly income by averaging his gambling earnings and adding that amount to his annuity income. *See In re Paternity of G.R.G.*, 829 N.E.2d 114, 119 (Ind. Ct. App. 2005) (holding trial court did not abuse its discretion by determining obligor's gross income by averaging his fluctuating income).

## Award of Healthcare Premiums to Mother

[16]     Father asserts the trial court erred in awarding Mother health insurance premium credit for half of 2016 and most of 2017. He argues these health insurance premiums were paid by Mother's ex-husband. However, Mother's testimony indicates that while Child was covered under Mother's ex-husband's

health insurance for a time, she was not covered during the 2016-2017 timeframe. Mother was paying COBRA, and Mother testified that COBRA cost $1,053 per month for her and her daughter. Father's argument that the trial court erroneously credited Mother for health insurance premiums is merely a request for us to reweigh the evidence, which we will not do. *See Ponziano Const. Servs., Inc. v. Quadri Enters., LLC*, 980 N.E.2d 867, 873 (Ind. Ct. App. 2012) (appellate court does not reweigh evidence or judge the credibility of witnesses).

[17] Father also argues the trial court erroneously awarded Mother credit for half of her total health insurance premium through Ambetter in calculating child support because he claims Mother failed to produce evidence regarding what portion of her health insurance premium is attributable to her and what portion is attributable to Child. Mother testified that her insurance premium cannot be broken down to determine what portion covers her and what portion covers Child. We cannot say the trial court abused its discretion in its award of credit for the healthcare premiums to Mother because evidence in the record supports the trial court's allocation. *See In re Paternity of Jo.J.*, 992 N.E.2d 760, 771 (Ind. Ct. App. 2013) (rejecting invitation to reweigh the evidence and holding trial court's determination of Mother's weekly gross income was not clearly erroneous).

# Modification of Settlement Agreement

[18]     Father argues the trial court impermissibly modified a settlement agreement when it specified a price range and conditions for the horse Father is to purchase for Child. The general rules of contract interpretation govern the interpretation of a settlement agreement. *Kiltz v. Kiltz*, 708 N.E.2d 600, 602 (Ind. Ct. App. 1999), *trans. denied*. If a contract is unambiguous, the court looks to the "four corners" of the document to determine the intent of the parties. *McCord v. McCord*, 852 N.E.2d 35, 43 (Ind. Ct. App. 2006), *trans. denied*. However, if a contract term is ambiguous, the court may allow evidence to clarify the ambiguity. *Id*. A term is ambiguous if reasonably intelligent people can differ as to the meaning of the term. *Id*.

[19]     The term "horse" in the March 13, 2015, agreed order is ambiguous because two reasonable people can interpret "horse" differently. There are many different breeds of horse, horses vary in price, and a rider will get along with some horses better than others. For instance, in this case, Father offered to purchase a horse with a sale price of $800, but Mother interprets "horse" to mean an animal worth over $10,000. Thus, the trial court did not err in taking evidence to clarify the meaning of the contract term "horse." Father testified that he wants Child to ride a horse that is safe and that he wants to be involved in selecting the horse. The trial court did not err in clarifying the term "horse" to be a steed that will meet Child's needs without being unduly expensive or in

providing a procedure for the parties to choose a suitable horse. *See Shepherd v. Tackett*, 954 N.E.2d 477, 482 (Ind. Ct. App. 2011) (holding trial court's order on meaning of "assignment" in dissolution decree was a clarification rather than a modification of the decree).

## Contempt

[20] Father argues the court erred in finding him in contempt for failing to pay for Child's 2017 and 2018 horseback riding lessons. A person is guilty of indirect contempt when he or she knows about a lawfully entered court order and willfully disobeys the order. *Mitchell v. Mitchell*, 785 N.E.2d 1194, 1198 (Ind. Ct. App. 2003). "However, the court's order must be clear and certain such that there is no question regarding what a person may or may not do and no question regarding when the order is being violated." *Id*. A court may not hold a party in contempt for failing to comply with an ambiguous or indefinite order. *Id*.

[21] Father argues the 2015 order was ambiguous because it ordered him to pay horseback riding fees only for 2015 and 2016. We disagree. The order directs Father to reimburse Mother for Child's extracurricular activities during the 2014-2015 school year, allocates financial responsibility for the 2015-2016 school year, and directs the parties to communicate regarding Child's extracurricular activities after the 2015-2016 school year, with Father to pay

84% of the fees associated with those activities. Therefore, even though the order mentions only 2015 and 2016, Father was aware of Child's interest in horseback riding and knew he would have to bear at least some of the financial burden if she continued the lessons beyond 2016.

[22] From the initial decree, the court apportioned a part of the ongoing expenses associated with Child's extracurricular activities to Father. As the trial court notes in paragraph 11 of the November 9, 2018 order, the parties could not have intended to return to court every year for modification of the settlement agreement when Child decided she wanted to continue horseback riding lessons. The order anticipated the parties would communicate and Father would pay his stated percentage for horseback riding lessons, or some other extracurricular activity, beyond 2016. Father's failure to pay constitutes contempt. *See id.* at 1198 (holding wife was in contempt when she surrendered a $100,616 life insurance policy for cash value and a court order directed her to transfer a $100,000 life insurance policy to daughter).

[23] However, the trial court puts the cart before the horse in finding Father in contempt for failing to purchase a saddle, because expert testimony indicates a saddle must be fitted to the horse and the parties have not yet agreed on a horse. Kieran Dulik testified saddles "are fit to the horse that they are used for. So there are narrow, there are wide, there are longer flaps, shorter flaps, so you want it to fit the horse that it's going to be used for." (Tr. Vol. 2 at 21.) Child

requires a jumping saddle, which can cost between $800 and $5,000. Dulik recommended a $1,200 saddle. Father testified that he is willing to purchase a saddle once the parties have agreed on a horse. However, Father and Mother disagree on the proper horse for Child and the March 13, 2015, order did not specify the type of horse, the age, or the cost of the horse. The trial court found Father to not be in contempt for his failure to purchase a horse but found Father in contempt because the March 13, 2015, order required him to purchase a saddle and he had not done so. These conclusions do not logically fit together. If Father is not in contempt for failing to purchase a horse, then he cannot be in contempt for failing to purchase a horse-specific accessory. Thus, Father should not be held in contempt for failing to purchase a saddle for a horse Child does not yet possess. *See Paternity of J.W. v. Piersimoni*, 79 N.E.3d 975, 982 (Ind. Ct. App. 2017) (reversing trial court's finding of contempt because mother's conduct did not amount to willful disobedience of court's parenting time order).

# Conclusion

[24] The trial court did not abuse its discretion in calculating Father's income, clarifying that the parties must find a horse for Child in the $3,000 to $10,000 price range, crediting Mother for the payment of healthcare premiums, or finding Father in contempt for failing to pay for Child's horseback riding lessons in 2017 and 2018. However, the trial court abused its discretion in finding Father in contempt for failing to purchase a saddle. Therefore, we

affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

[25] Affirmed in part, reversed in part, and remanded.

Mathias, J., and Brown, J., concur.